UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHANNA MICHELLE KIEDROWSKI, <br><br> Petitioner, <br><br> v. <br><br> NANCY A. BERRYHILL, <br> Acting Commissioner of Social Security <br> Administration, <br><br> Respondent. | Case No. 1:17-CV-00460-CWD <br><br> **MEMORANDUM DECISION <br> AND ORDER** |

## INTRODUCTION

Currently pending before the Court for its consideration is Shanna Michelle

Kiedrowski's Petition for Review of the Respondent's denial of social security benefits,

filed November 6, 2017. (Dkt. 1.) The Court has reviewed the Petition for Review and

the Answer, the parties' memoranda, and the administrative record (AR), and for the

reasons that follow, will affirm the decision of the Commissioner.

**MEMORANDUM DECISION AND ORDER - 1**

## PROCEDURAL AND FACTUAL HISTORY

Petitioner filed a Title II application for Disability Insurance Benefits and Supplemental Security Income on September 30, 2014, claiming disability since April 14, 2014,[1] due to degenerative disk disease-status post lumbar fusion, osteoarthritis of the right sacroiliac joint, Ehlers-Danlos syndrome, and obesity. This application was denied initially and on reconsideration, and a hearing was held on October 4, 2016, before Administrative Law Judge (ALJ) Mark Kim. After hearing testimony from Petitioner, vocational expert Polly Peterson, and medical expert John Kwock, M.D., ALJ Kim issued a decision finding Petitioner not disabled on November 22, 2016. Petitioner timely requested review by the Appeals Council, which denied her request for review on September 6, 2017. Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Petitioner was 38 years of age. Petitioner has a high school level education, is married, and lives with her husband and three teenage children. Petitioner's prior employment experience includes work as a human resource administrator, a front desk clerk, and a retail cashier.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must

---

[1] This alleged onset date was later amended to September 25, 2014, as September 23, 2014, was the last date Petitioner worked.

**MEMORANDUM DECISION AND ORDER - 2**

be determined whether the claimant is engaged in substantial gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity since her alleged amended onset date, September 25, 2014. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found each of Petitioner's impairments – degenerative disc disease of the lumbar spine-status post lumbar fusion, osteoarthritis of the right sacroiliac joint, Ehlers-Danlos syndrome, and obesity– severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found that Petitioner's impairments did not meet or equal the criteria for the listed impairments, specifically, 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.R.F. 404.1520(d). 404.1525 and 404.1526). If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work. The ALJ found Petitioner was not able to perform her past relevant work as a human resource administrator, front desk clerk, or retail cashier.

If a claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate, at step five, that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education, and work experience.  At step five, the ALJ found, considering Petitioner's

age of 36 years at the time of the alleged onset date, high school level education, and work experience, that she retained the capacity to perform a limited range of sedentary work, as defined in 20 C.F.R. 404.1567(a). The ALJ imposed the following limitations in addition to the sedentary occupational base: Petitioner can no more than occasionally push or pull with right lower extremities or frequently balance; can occasionally can stand, kneel and climb ramps and stairs, but never crouch, crawl or climb ladders, ropes or scaffolds; must avoid all exposure to excessive vibrations and hazards; and, perform no more than simple, routine tasks due to physical pain and the effects of medication. Considering testimony from vocational expert Peterson, and providing the forgoing limitations, the ALJ found Petitioner could perform the requirements of representative occupations such as document preparer, final assembly optical, and lamp shade assembler. As such, the ALJ found Petitioner not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind

**MEMORANDUM DECISION AND ORDER - 4**

of substantial work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

**MEMORANDUM DECISION AND ORDER - 5**

## DISCUSSION

Petitioner believes the ALJ erred at step four of the sequential process in three ways. First, Petitioner argues the ALJ failed to provide specific and legitimate reasons supported by substantial evidence when assigning little weight to the findings of treating providers and assigning greater weight to the opinions of an examining physician and non-examining medical sources. Second, Petitioner argues the ALJ failed to provide reasons germane to each lay witness when assigning less than full weight to their testimony. Third, Petitioner argues the ALJ's RFC findings failed to include limitations identified by Petitioner's treating physicians and was thus defective. Respondent disagrees, arguing the ALJ reasonably evaluated the medical opinion evidence because there was little to no medical evidence in the record supporting Petitioner's allegations of severe pain and limitation. Respondent contends also that the ALJ gave sufficient reasons germane to the lay witnesses to discount their testimony.

### A.        Physician testimony

Petitioner argues the ALJ erred in rejecting or assigning little weight to the opinions of her treating neurologist, treating primary care physician, and treating rheumatologist, and assigning more weight to the opinions of an examining but non-treating provider, a state-agency reviewing physician, and the non-examining testifying medical advisor. After careful consideration and noting that there is evidence in the record to make an alternative finding, the Court finds the ALJ gave legitimate and specific reasons supported by substantial evidence in the record for assigning little weight

to the treating physicians' opinions, and thus did not commit legal or factual error.

Ninth Circuit cases distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians). *Lester v. Chatter*, 81 F.3d 821, 830 (9th Cir. 1995). "The ALJ is responsible for resolving conflicts in the medical record." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). Generally, the ALJ accords more weight to the opinions of treating physicians than to non-treating physicians. *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). If a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). If a treating physician's opinion is contradicted by another physician, the Commissioner may not reject the treating physician's opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

An ALJ is not required to accept an opinion of a treating physician if it is conclusory and not supported by clinical findings. *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). However, an examining physician's opinion is entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).

Additionally, an ALJ is not bound to any physician's opinion of a claimant's

physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the record as a whole does not support a physician's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support a physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities. *Id.*; *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999).

In this matter, the ALJ assigned little weight to the opinions of Petitioner's treating providers based in large part on his review of the opinions in light of the objective medical evidence in the record as a whole. (*See* AR 27.) Considering this justification, prior to reviewing the ALJ's decision as to each provider, the Court will provide a brief summary of Petitioner's medical history, as is discernable by a review of the objective medical evidence in the record as well as the treatment notes of Petitioner's providers.

On April 4, 2006, Petitioner suffered a work-related injury. (AR 214; 546.) She fell onto her left buttock on a hard floor surface while attempting to move a cement mixer. *Id.* Testing performed after the accident revealed that Petitioner had sensory loss in her lower left extremity. *Id.* Petitioner returned to work after the accident. Initially, she received chiropractic treatment and sacroiliac joint (SI) injections to treat her injuries. *Id.* At that time, Petitioner reported having difficulty walking more than one half of a mile due to pain in her lower left extremity. (AR 445.)

**MEMORANDUM DECISION AND ORDER - 8**

Petitioner, who is 5 feet 5 inches tall, weighed approximately 123 pounds in 2006. (AR 444.) An MRI of Petitioner's lumbosacral spine taken on July 7, 2006, showed a possible bilateral pars defect at L5 and a grade I anterolisthesis on L5-S1, as well as a disc bulge at L5-S1, with moderate bilateral foraminal stenosis. Eventually, on August 9, 2007, Petitioner had surgery to correct the defect in her spine—a L5-S1 discectomy, with posterior effusion and internal fixation, with pedicle screws and end rods. *Id.* Petitioner continued to work after recovery from her spinal surgery.

In September and October of 2008, Petitioner was seen seven times by Kevin Marsh, D.C., for complaints of back pain. (AR 475-77.) The primary chiropractic diagnosis was thoracic somatic dysfunction and associated myofascial pain syndrome. *Id.*

In 2010, Petitioner weighed 155 pounds. (AR 548.) At that time, she reported minimal lower back pain that became severe as the day progressed. (AR 547.) She reported being able to sit or stand for about 30 minutes at a time before having to change to the opposite, either sitting or standing. *Id.* As in 2006, Petitioner reported being able to walk for about one half of a mile. *Id.* Petitioner's gait was normal in 2010. (AR 549.) An examining physician found Petitioner would be expected to be able to sit for 30 minutes at a time for up to 4 hours during a work day and stand or walk for 30 minutes for up to four hours during a work day. (AR 549.)

In June 2014, Petitioner reportedly injured her back again while moving a steam cleaner. (AR 72; 380; 572.) In July 2014, Petitioner weighed 193 pounds, with a body mass index of 31.4. (AR 573.) She was unable to tolerate sitting for any extended period

of time. *Id.* Her sacroiliac (SI) joints were tender to palpation. *Id.* She had decreased light touch sensory in her right leg and foot. *Id.* Changes to her gait had also taken place since 2010. *Id.* In 2014, Petitioner had difficulty with heel walking due to pain, and her gait was mildly antalgic.

A few months later, in September 2014, Petitioner presented for an office visit being "absolutely miserable with pain in her sacroiliac area." (AR 575.) From this point forward, the medical records show Petitioner consistently reported SI pain, was prescribed and took medication for it, and participated in physical therapy to obtain pain relief. Petitioner planned to undergo an SI joint fusion surgery as an effort to eliminate or reduce her SI pain. *Id.* In addition to developing significant SI pain, in 2015, Petitioner was diagnosed with chronic pain syndrome and Ehlers-Danlos syndrome. With this background of Petitioner's medical history in mind, the Court will review the weight assigned by the ALJ to the various physicians' opinions.

>   i.   *Bret Dirks, M.D. and Morgan Ford, M.D. – Treating Physicians*

The ALJ considered a note from Petitioner's treating neurologist, Bret A. Dirks, M.D., dated September 25, 2014. (AR 589.) The note itself is a type-written form, where Dr. Dirk's circled the option "is not" to indicate Petitioner was not released to work as of "September 25, 2014." *Id.* Dr. Dirks did not enter any other information on the form. *Id.* The ALJ considered a similar note made by Petitioner's primary care physician, Morgan D. Ford, M.D., dated January 29, 2015. (AR 620.) Dr. Ford's note is handwritten on a prescription slip and states only that Petitioner was "not able to work in any capacity,

from September 25, 2014 until she [got] approval for and recovery from right iFuse SI joint procedure." *Id.*

The ALJ assigned both notes little weight, because he found they were not supported by objective medical evidence or consistent with the medical evidence of record when viewed as a whole. The ALJ found also that the doctors were not qualified to render vocational opinions as to whether the Petitioner could perform work. In response, Petitioner argues the ALJ's findings do little more than offer the ALJ's own conclusions. Petitioner asserts the ALJ's findings are legally insufficient because the ALJ did not meaningfully consider Dr. Dirks' and Dr. Fords' opinions before disregarding them. (citing *Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012); *Reddick v. Shater*, 157 F.3d 715, 725 (9th Cir. 2008)).

Although these notes contain limited opinions, the opinion they both contain –that Petitioner could not work due to sacroiliac joint pain and related symptoms– is generally contradicted by the opinions of non-treating physicians who found Petitioner could work despite her allegations, including those related to SI joint pain. As such, the Court reviews the ALJ's decision under the substantial evidence standard. To this end, the record contains the following information relevant to Petitioner's SI joint pain.

Dr. Dirks's treatment notes from Petitioner's office visit of September 2014 record that he had a lengthy discussion with Petitioner about her options for treating her SI pain, and that she had tried every nonsurgical therapy her doctor could think of. (AR 575.) After Dr. Dirks explained the risks associated with a surgical treatment option, the

"iFuse" surgery, Petitioner indicated that she wanted to proceed with the procedure on her right SI joint. *Id.* Petitioner's health insurance company denied the procedure on the basis that the company considered it to be "investigational as the current scientific evidence is not yet sufficient to establish the impact to sacroiliac joint stabilization for arthrodesis, including the use of the iFuse … system on health outcomes." (AR 620.)

Despite the insurance company's refusal to provide coverage for the procedure, the record contains evidence that Petitioner reported to Dr. Dirks and others experiencing SI pain and resultant symptoms, including worsening symptoms with prolonged sitting, standing, and walking, as well as weakness in her leg. (*See* AR 967, 655). For example, on October 16, 2015, Petitioner was seen by Dr. Dinning for SI joint inflammation. (AR 657.) The clinic administered steroid injections and prescribed Lyrica for the pain. *Id.* She was also prescribed a wheelchair on that date because she was "unable to ambulate by herself" and could not "bear weight without extreme pain." *Id.*

The wheelchair was prescribed so that Petitioner could be transported without the risk of falls. *Id.* This was likely also related to Petitioner's diagnosis of Ehlers-Danlos syndrome.[2] (*See* AR 666.) Nevertheless, Petitioner reported falling "more frequently secondary to pain" and was "unsteady attempting to ambulate with a cane or walker on her own." (AR 657.) Petitioner also saw Dr. Dinning again for SI related pain in August 2016. (AR 910.) One of Dr. Dinning's notes from the visit states, "Patient is in a lot of

---

[2] Ehlers-Danlos syndrome is a type of disorder that, in its most common variety, produces joint hyper mobility. (Dkt. 48-98.)

pain. We need to get her pain under control." *Id.*

In August 2016, Petitioner was seen by Abhineet Chowdhary, M.D., for consultation regarding her SI joint disfunction. (AR 898.) At the time, Petitioner reported that she had midline low back pain with radiating symptoms through her right buttock that had worsened over the previous two years. *Id.* The treatment notes state Petitioner had been using a cane to distribute her weight to the left side to reduce the pain that she experienced on the right side while walking. *Id.* Testing performed that day showed she was positive for pain in several areas related to her SI joint. (AR 903.)

As stated above, the ALJ assigned Dr. Dirks's and Dr. Ford's notes little weight because he found they were not supported by objective medical evidence or consistent with the medical evidence of record as a whole. The record contains the following objective medical evidence related to SI pain and lower back pain in the form of MRIs and CT scans of Petitioner's lumbar spine and pelvis.

An MRI of her lumbar spine in June 2006 showed normal height of lumbar vertebral bodies, decreased signal in region of the L5 pars, with discs unremarkable except for L5-S1, which showed a moderate disc bulge. (AR 346-47.) An MRI of Petitioner's pelvis in April 2006 showed normal and unremarkable results. (AR 438.) Images from November 2010 showed similar unremarkable results. (AR 553-54.) A CT scan of Petitioner's spine and pelvis in July 2014, showed minor anterior offset at L5-S1, no evidence of hardware failure, and calcification with benign irregular margination and body trabeculae right superior sacrum, which was specifically noted to be not

significantly changed compared to the earlier MRI in 2006. (AR 563.) The results also showed preservation of the L1-2 through L4-5 disc interspaces, with no vertebral body collapse and no significant osseous narrowing of the neural foramen. *Id.* Another MRI record from June 2014 returned similar results. (581-82.) An MRI report from October 2015 presented similar findings, including normal height of lumbar vertebral bodies with the exception of L5-S1 where there was the previously noted loss of disc height. (AR 676; 792.) The MRI also showed unremarkable sacroiliac joints. (AR 677; 793.) A CT scan of Petitioner's spine from August 2016, showed normal vertebral body height, no fractures or bony lesions, intact hardware at the L5 level, benign appearing sclerosis in the right side of the S1 segment that was "stable", but that there was a "vacuum disc phenomenon of the sacroiliac joints, indicating degeneration." (AR 912-13.) A CT scan was taken of the pelvis in August 2016, recorded results showing that Petitioner's sacroiliac joint appeared symmetric, with no sclerosis or ankylosis, and showed the same vacuum phenomena present within both SI joint spaces, indicating degeneration[3] with otherwise unremarkable SI joints. (AR 914.)

Thus, the objective medical evidence of record related to Petitioner's SI pain does not show significant changes over time. The Court notes the vacuum phenomena is present in the SI joint shown by the August 2016 scan. This evidence could support an alternative finding as to the weight to assign to Dr. Dirks's and Dr. Ford's notes related to

---

[3] The Court notes that this degeneration is consistent with arthritis in the SI joint, as explained by Dr. Clark in his testimony. (AR 51.)

Petitioner's SI pain.[4] However, those notes were written in 2014, before any degeneration in Petitioner's SI joint was identified on any of the MRIs or CT scans. In close cases like this, the Court must defer to the ALJ's decision provided the ALJ offers a reasonable interpretation of the record as a whole based on substantial evidence. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). The Court finds the ALJ did so here.

ii. *Dustin Dinning, D.O. – Treating Physician*

The ALJ also discussed his consideration of the opinions of Petitioner's treating rheumatologist, Dustin Dinning, D.O. His opinions are contained in a medical source statement dated October 6, 2016. (AR 958-61.) The ALJ noted that Dr. Dinning "reported a diagnostic impression of Ehlers-Danlos syndrome, osteoarthritis and chronic pain syndrome." (AR 27.) The ALJ noted also that Dr. Dinning recorded that Petitioner had pain, fatigue, and hypermobility in her joints. Dr. Dinning ultimately opined that Petitioner was able to walk less than the distance of one block, sit for 20 minutes at a time for less than 2 hours in total, that she would need to change positions often, and take unscheduled breaks.

Dr. Dinning opined further that Petitioner would need to use a hand-held device to stand or walk and could rarely lift or carry ten pounds. Dr. Dinning included additional restrictions on Petitioner's physical abilities, stating Petitioner could never stoop, crouch, use stairs or ladders, and had limited ability to reach in all directions. Dr. Dinning opined

---

[4] The ALJ made an adverse credibility finding. (AR 24.) However, Petitioner did not challenge that finding. Her arguments are limited to challenging the ALJ's findings related to medical evidence and lay witness testimony. (*See* Dkt. 14 at 18-20.)

also that it would be expected that Petitioner would be off task 25 percent of the work day and would miss four or more days of work each month.

The ALJ assigned the opinions of Dr. Dinning little weight, because he found Dr. Dinning "provided little or no objective medical evidence in support" of the opinion regarding Petitioner's ability to work. The ALJ found also that Dr. Dinning's opinions were not consistent with the objective medical evidence in the record, as described and discussed by the medical expert, Dr. Kwock, after his own review of the entire record. (AR 27.)

Petitioner challenges the ALJ's assignment of little weight to Dr. Dinning's opinions, asserting the ALJ failed to cite the statutorily requisite factors for evaluation of treating physicians' opinions— set forth in 20 C.F.R. § 404.1527(c)(2). Petitioner argues also that Dr. Dinning's opinion that Petitioner could not return to full time work was consistent with the opinions of Drs. Dirks and Ford. Petitioner asserts further that the ALJ selectively cited to the record to support his weighting of Dr. Dinning's opinion, specifically ignoring Dr. Dinning's diagnosis of chronic pain syndrome, and the impacts of pain on Petitioner's ability to physically function.

When an ALJ does not give a treating physician's medical opinion full weight, various factors are considered, including the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the amount of evidence presented by the physician to support the opinion, consistency of the opinion with the record as a whole, whether the opinion was provided by a specialist about

medical issues related to his or her area of specialty, and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2).

In this case, the ALJ considered whether Dr. Dinning's opinion was consistent with the record as a whole as reviewed and explained by Dr. Kwock. The United States Court of Appeals for the Ninth Circuit has "consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician, based *in part* on the testimony of a nontreating, nonexamining medical advisor." *See Morgan v. Commn'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (where the ALJ pointed to specific evidence in addition to his personal observations, and the opinion of the non-treating, non-examining medical advisor to support rejection of treating physician testimony.) Thus, the opinions of a non-examining, testifying medical advisor may serve as substantial evidence when the opinions are supported by and consistent with other evidence in the record. *Id.* at 600.

John F. Kwock, M.D.,[5] served as a testifying medical expert in this case. (AR 26.) Dr. Kwock was a non-treating, non-examining physician who reviewed the entire case file prior to the hearing. Dr. Kwock testified that he considered the diagnosis of Ehlers-Danlos but had not found anything in Petitioner's medical records to substantiate the diagnosis. (AR 48.) Dr. Kwock testified that a genetic work up is required to determine which, if any, of the six Ehlers-Danlos varieties presents itself in Petitioner. *Id.* at 48-49.

---

[5] In the transcript of the Oral Hearing, Dr. Kwock is referred to as "Dr. Clark." This appears to be an error in transcription as Dr. Kwock's physician qualifications appear in the record and his name is used by the parties in briefing. (*See* AR 899-91.)

Dr. Kwock's review of the record did not reveal any objective medical evidence to establish the characteristics of Ehlers-Danlos—instead the characteristics were self-reported by Petitioner and recorded in office visit progress notes by her care providers. *Id.* Dr. Kwock acknowledged that at least one clinical test in the record that found Petitioner had hypermobility in her joints –a common symptom of Ehlers-Danlos– but opined that it alone was not sufficient to establish the syndrome because hypermobility is present in individuals without Ehlers-Danlos. (AR 49.)

Dr. Kwock's opinion regarding the necessity of genetic testing to determine the nature of Petitioner's Ehlers-Danlos syndrome, and whether she had it at all, is consistent with other evidence in the record. Specifically, the record shows Dr. Ford discussed Petitioner's Ehlers-Danlos syndrome with her at a visit on November 13, 2014. (AR 616.) Petitioner presented to get a confirmatory diagnosis of the syndrome after being advised by Dr. Dinning that Petitioner's daughter, who had recently also been diagnosed with the syndrome, had inherited it from Petitioner. *Id.* At the visit, Petitioner reported to Dr. Ford common symptoms of Ehlers-Danlos, including constant joint aching and pain and a sensation of instability in her joints. *Id.* Dr. Ford advised Petitioner that she was "certainly no expert" about the syndrome. *Id.* at 618. During the visit, they looked up some of the genetic mutations that can be confirmatory in conjunction with the classic signs and symptoms. *Id.* The treatment notes state that "genetic testing appeared to be highly specialized and not easily attainable" from the clinic's local lab. *Id.* In light of this, Dr. Ford referred Petitioner back to her rheumatologist, Dr Dinning, for her to be seen,

confirmed, and for treatment agreed upon.[6] *Id.*

Dr. Kwock testified also that the objective medical evidence, specifically CT scans, MRIs, and X-rays of Petitioner's lumbar spine and pelvis, did not support Petitioner's allegations of severe pain. (AR 56-59.) Dr. Kwock noted, however, that an X-ray taken in April 2015 showed mild degenerative changes in Petitioner's right SI joint, indicative of joint arthritis. *Id.* at 59. As discussed in detail above, the objective medical evidence showed little to no change in Petitioner's spine from the time period after she had her spinal surgery in 2007 through 2016. Similarly, the objective medical evidence showed only a very slight change in the condition of Petitioner's pelvis— specifically, mild degeneration in her SI joint in August of 2016. For these reasons, Dr. Kwock's opinions as to whether the objective medical evidence supported Petitioner's claims about the severity and limiting effects of her conditions is consistent with other evidence in the record.

In sum, because Dr. Kwock's opinions were consistent with other medical evidence in the record, it was not error for the ALJ to cite Dr. Kwock's opinions as substantial evidence to support his decision to assign little weight to the opinion of Dr. Dinning regarding Petitioner's ability to work based on a review of the medical evidence of record.

---

[6] The record contains no evidence that any genetic testing was performed to confirm Dr. Dinning's observational diagnosis of Ehlers-Danlos syndrome.

### iii.    *John Casper, M.D. – Consulting Orthopedic Physician*

The ALJ also considered John B. Casper, M.D.'s Consultative Orthopedic Examination, dated November 19, 2010. (AR 546-47.) The ALJ noted Dr. Casper's diagnosis of Petitioner's lower back pain status post L5-S1 fusion and her obesity. Dr. Casper's physical examination of Petitioner showed she had a decreased range of motion in her lumbar spine, but a normal gait and normal results on a neurological exam. To make his ultimate findings, Dr. Casper reviewed a 2006 MRI (AR 436-38) and 2006 X-rays of Petitioner's lumbar spine. Dr. Casper ultimately opined that Petitioner would be able to sit for 30 minutes at one time, for a total of 4 hours, could stand or walk for 30 minutes at a time, for a total of 4 hours, and could lift or carry a maximum of 20 pounds. The ALJ assigned great weight to the opinions of Dr. Casper, because he found they were "internally consistent" and consistent with the record as a whole. (AR 27.)

Petitioner challenges the weight assigned to Dr. Casper's opinions on the basis of relevance. Petitioner argues that, because Dr. Casper's examination occurred approximately 3.5 years prior to the 2014 alleged onset date, his opinions have little relevance (citing *Carmickle v. Astrue*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance."). Petitioner also challenges the weight assigned to Dr. Casper's opinion on the basis of its inconsistency with the opinions provided by Drs. Dirks, Ford, and Dinning. Petitioner argues that Dr. Casper's opinion is not consistent with the record as a whole, and the ALJ erred in assigning it great weight. As the Court has already found the ALJ did not commit

**MEMORANDUM DECISION AND ORDER - 20**

error in assigning little weight to the opinions of Drs. Dirks, Ford, and Dinning, the Court will move to a discussion of Petitioner's relevance challenge.

Notably, the 2006 MRI and X-rays that Dr. Casper reviewed to form his conclusions were taken prior to 2014, when Petitioner alleges disability began. However, Dr. Casper also ordered images of her spine in 2010, which he reviewed in concert with his physical examination of Petitioner. (AR 553.) Those showed the prior fusion at L5-S1, with mild antral listhesis on L5 on S1 and mild loss of disc height at that level, but otherwise unremarkable results, showing normal appearance of both the sacrum and the sacroiliac joints. *Id.* Thus, the images reviewed by Dr. Casper from 2010 contained similar findings as those from 2006.

As stated above, the CT scan of Petitioner's spine and pelvis in July 2014 showed minor anterior offset at L5-S1, no evidence of hardware failure, calcification with benign irregular margination and body trabeculae right superior sacrum, noted to be not significantly changed compared to MRI of April 2006. (AR 563.) An MRI report from October 2015, presented similar findings including normal height of lumbar vertebral bodies with the exception of L5-S1 where there was the previously noted loss of disc height. (AR 676; 792.) The MRI also showed unremarkable sacroiliac joints. (AR 677; 793.) As discussed above, it was not until the August 2016 CT scan of Petitioner's pelvis that indications of degeneration in Petitioners SI joints were present. (AR 914.)

Petitioner rightly argues that opinions predating the alleged onset date are usually of limited relevance. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th

**MEMORANDUM DECISION AND ORDER - 21**

Cir. 2008). The United States Court of Appeals for the Ninth Circuit explained in

*Carmickle* that it is "especially true in cases [...] where disability is allegedly caused by a

discrete event." *Id.* However, in a 2012 unpublished opinion, "the court emphasized that

the ALJ must still consider all medical opinion evidence." *Henderson v. Comm'r, Soc.*

*Sec. Admin.*, No. 6:17-CV-00481-HZ, 2018 WL 2102401, at *9 (D. Or. May 4, 2018)

(citing *Williams v. Astrue*, 493 Fed. Appx. 866, 868–69 (9th Cir. 2012) (the court found

error when an ALJ ignored medical opinions formed up to six years prior to the alleged

onset date). "Thus, while the date of the opinion may be one factor the ALJ" considers in

deciding what weight to give a medical opinion, an opinion "is not insignificant or not

probative merely because it is rendered prior to an alleged onset date, particularly in

cases where the claimant suffers from an ongoing impairment." *Id.* Such is the case here.

For this reason, and because the scans of Petitioner's spine did not change

significantly between 2006, 2010, 2014, and even 2016, the Court finds the ALJ did not

commit error in assigning the 2010 opinion of Dr. Casper great weight. Furthermore, as

pointed out by Respondent, since her 2007 surgery, Petitioner has reported a history of

chronic back pain and leg pain. (Dkt. 19 at 15.) Thus, it was reasonable for the ALJ to

conclude that Dr. Casper's findings were consistent internally and with the objective

record evidence. Any potential error in this regard is harmless, however, because even if

the ALJ had assigned Dr. Casper's opinion little weight, that decision would be

inconsequential to the ALJ's ultimate non-disability determination. This is true because,

as discussed herein, the ALJ did not err in assigning great weight to the opinions of Dr.

Kwock and Dr. Arnold, both of whom reviewed the record after Petitioner's alleged onset date and determined she retains the capacity to perform work. *See generally Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (and cited cases).

### *Leslie Arnold, M.D. – State Agency Medical Reviewer*

The ALJ also considered of the opinions of Leslie Arnold, M.D., a state medical consultant who reviewed the evidence on record as of February 23, 2015. The ALJ noted that Dr. Arnold identified Petitioner's severe medically determinable impairments as a spine disorder and a ligament or muscle disorder.[7] (AR 26.) Dr. Arnold concluded Petitioner could work at the sedentary level with limited postural activities and environmental restrictions. *Id.* The ALJ gave Dr. Arnold's[8] opinion great weight because the ALJ found Dr. Arnold's opinion was "based on his expertise, familiarity with Social Security regulations, his opportunity to review the medical evidence and because his opinions are generally consistent with the record." *Id.*

Petitioner asserts the opinions of Dr. Arnold are inconsistent with the findings of three treating physicians, and thus are not consistent with the record as a whole. Additionally, Petitioner points out that Dr. Arnold did not review any evidence after February 2015, including Dr. Dinning's functional assessment. Finally, Petitioner notes that Dr. Arnold included certain limitations in his findings, including that Petitioner

---

[7] Notably, Dr. Arnold did not specifically identify this ligament/muscle disorder as Ehlers-Danlos.

[8] The ALJ's opinion misidentifies Dr. Arnold as "Dr. Hale" at this point in the opinion. The Court believes the reasons the ALJ cites for giving the opinion of "Dr. Hale" great weight apply to Dr. Arnold. (*See* AR 26.)

**MEMORANDUM DECISION AND ORDER - 23**

would need a hand held device to walk, that the ALJ did not include these limitations in his RFC findings. (Dkt. 21 at 18.) In response, Respondent asserts the ALJ reasonably afforded significant weight to Dr. Arnold's opinion, because Dr. Arnold had the benefit of reviewing the entire record through August 2015 and has extensive experience with the applicable Social Security law and regulations. (Dkt. 19 at 8.)

Because the Court found the ALJ did not err in assigning little weight to the opinions of Petitioner's treating physicians, and for the reasons stated above related to the timeliness of the opinions of Dr. Casper, the Court finds no error in the ALJ's decision to assign great weight to the opinion of Dr. Arnold.

> iv.    *John F. Kwock, M.D. – Testifying Medical Expert*

As discussed above, the ALJ also considered the opinions offered by testifying medical expert and certified orthopedic surgeon John Kwock, M.D. (AR 26.) The ALJ noted that Dr. Kwock had the benefit of reviewing the entire medical record when forming his opinions, which included Petitioner's medically determinable impairments of degenerative disc disease of the lumbar spine-status post fusion, osteoarthritis of the right sacroiliac joint, and obesity, with a body mass index of 35. The ALJ noted also that Dr. Kwock acknowledged the Petitioner's diagnosis of Ehlers-Danlos syndrome, but "explained that the medical evidence did not substantiate this disease, as there are any one of six different varieties that require genetic tests to establish a valid diagnosis." (SR 26.) Acknowledging that Petitioner uses a cane and a wheelchair, and that there was evidence of joint hypermobility in the record, Dr. Kwock still found that the record was

inconclusive as to what form or whether the diagnosis was valid.

Petitioner points out that "the ALJ did not address the fact that Dr. Kwock did not address the diagnosed Pain Disorder or Syndrome and Dr. Kwock also stated the he would not operate on Petitioner, however he also acknowledged that he is 'not a spine surgeon….'" (Dkt. 14 at 17.) Although not clearly stated, this appears to be a restatement of Petitioner's argument that the ALJ erred in assessing the medical evidence by selectively considering some evidence while ignoring other evidence. *See Id.* at 9 and 14. In addition, as mentioned above, the primary symptom of Petitioner's Ehlers-Danlos syndrome was joint hypermobility—which is not a symptom exclusively related to the joints of the spine. (*See supra* note 2.)

The Court finds Petitioner's argument unpersuasive. The ALJ specifically stated that he gave great weight to the "detailed explanation" Dr. Kwock provided of the "objective medical evidence as pertaining to the general absence of objective findings in comparison with the level of pain and disability asserted by the claimant." (AR 26.) However, upon review of the medical evidence as a whole, which necessarily included Petitioner's diagnosis of chronic pain syndrome, the ALJ found "that the medical evidence of record supported greater restrictions than those opined by Dr. Kwock." *Id.*

In sum, for the foregoing reasons, the Court finds the ALJ reasonably weighed the medical opinion evidence because his reasons for assigning little weight to the opinions of Petitioner's treating providers were specific and legitimate and supported by substantial evidence in the record.

**MEMORANDUM DECISION AND ORDER - 25**

**B.      Lay Witness Testimony**

In this matter, two of Petitioner's prior workplace managers provided lay witness testimony in support of her application for disability benefits. Petitioner argues that the ALJ committed error by failing to provide specific reasons germane to each lay witness sufficient to effectively reject their statements. (Dkt. 14 at 20.)

An ALJ must consider evidence from sources other than the claimant, including family members and friends, to show the severity of a claimant's impairment. 20 C.F.R. § 404.1513(d)(4); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). Lay testimony regarding a claimant's symptoms constitutes competent evidence that an ALJ must consider, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (internal citations omitted)); *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294 (9th Cir. 1999). Such reasons include conflicting medical evidence, prior inconsistent statements, or a claimant's daily activities. *Lewis v. Apfel*, 236 F.3d 503, 511–12 (9th Cir. 2001).

In rejecting lay testimony, "the ALJ need not cite the specific record as long as 'arguably germane reasons' for dismissing the testimony are noted, even though the ALJ does 'not clearly link his determination to those reasons,' and substantial evidence supports the ALJ's decision." *Holzberg v. Astrue*, No. C09-5029BHS, 2010 WL 128391 at *11 (W.D. Wash. Jan. 11, 2010) (citing *Lewis*, 236 F.3d at 512). However, "where the ALJ's error lies in failure to properly discuss competent lay testimony favorable to the

claimant, a reviewing court cannot consider the error harmless unless it can confidently

conclude that no reasonable ALJ, when fully crediting the testimony, could have reached

a different disability determination." *Stout v. Comm'r of Soc. Sec. Admin*., 454 F3d 1050,

1056 (9th Cir. 2006).

i.    *Paul Davis*

The first lay witness statement was provided by Paul Davis, a manager at the Post

Falls Cabela's store where Petitioner worked as a human resources engineer. (AR 408.)

Mr. Davis's lay witness testimony provides that he witnessed Petitioner's physical

deterioration over the course of the two years he worked with her at the store. *Id.* Mr.

Davis described Petitioner as an excellent employee who worked hard. *Id.* His testimony

states that "[i]t was not uncommon for her to physically overdo herself and be in pain for

multiple days at a time" due to her previous back injury. *Id.* Mr. Davis observed that,

after overexerting herself, it took several days before Petitioner was back to her normal

working abilities. *Id.* Notably, Mr. Davis's testimony states that Petitioner was "seriously

injured[9] in June of 2014, and her ability to maintain her duties became unbearable." *Id.*

Mr. Davis's testimony indicates Petitioner's abilities changed very quickly, for example

her "ability to walk went from a very face-paced stride to a very unsteady and slow walk,

with the assistance of a cane." Mr. Davis provided that it was his personal and

professional opinion that, if Petitioner could still be working, she would be. *Id.*

---

[9] As noted previously, Petitioner stated that she injured her self again while moving a steam
cleaner. (AR 72; 380; 572.)

**MEMORANDUM DECISION AND ORDER - 27**

## ii. *Linda Adams*

The second lay witness statement was provided by Linda Adams, Human Resources Manager at the same Post Falls Cabela's store. (AR 418.) In addition to describing Petitioner's duties at work, Ms. Adams testified that, around late August or early September 2014, Petitioner "was not able to move, walking or sitting, as she had at the beginning of her employment." *Id.* Specifically, that Petitioner "was not able to sit for long, maybe a half hour at a time" and could not "walk very far without being in pain." *Id.* Ms. Adams testified that, by the end of September 2014, Petitioner "was barely able to walk, let alone sit for any time at all." *Id.*

The ALJ acknowledged Mr. Davis's and Ms. Adams's testimony that described Petitioner as having difficulty keeping up with her work due to pain—specifically difficulty walking, sitting, bending, stooping, and lifting. The ALJ gave partial weight to each lay witness's testimony, because they were limited in their observations of Petitioner and because they each lacked medical training to evaluate her condition.

First, the Court does not find that either Mr. Davis nor Ms. Adams made any specific medical evaluations of Petitioner's conditions, beyond Mr. Davis's conclusion that Petitioner had seriously injured herself. Beyond that conclusive observation, each of the lay witnesses' statements reasonably describe their observations of changes to Petitioner's ability to work. However, the ALJ's other reason, that Mr. Davis and Ms. Adams were limited in their observations of Petitioner, is germane to each and is supported by substantial evidence.

**MEMORANDUM DECISION AND ORDER - 28**

Mr. Davis and Ms. Adams both worked with Petitioner for approximately one and one half to two years at the Post Falls Cabela's store. Yet, the timeframe during which each was able to observe Petitioner once she began having difficulty performing her work was limited. According to their testimonies, Petitioner began to experience difficulty in performing the duties of her job from either June 2014 (in the memory of Mr. Davis) or late August to early September 2014 (in the memory of Ms. Adams).[10] The record shows that Petitioner stopped working at the store on September 23, 2014. As such, Ms. Adams had one month or less to observe Petitioner once her abilities so drastically changed. Mr. Adams had a bit more time.

Notably, the ALJ did not ignore or fully reject the testimony provided by Mr. Davis and Ms. Adams. Instead, he gave the statements partial weight, based on the timeframe of the lay witnesses' observations of Petitioner. This reason is germane to each lay witness and is supported by substantial evidence. (*See Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1996) (where "sufficient contact with [the claimant] during the relevant time" is a factor germane to evaluating a witness's testimony.) *Crane* concerned the testimony of a social worker who saw the claimant only two weeks before the claimant's alleged disability onset date, and thus is distinguishable from this case. However, the amount of time for observation of a claimant while she is experiencing the limitations upon which she bases a claim for disability benefits is a factor germane to determining

---

[10] Notably, the time periods cited by each lay witness for the drastic change to Petitioner's performance at work do not entirely match up.

**MEMORANDUM DECISION AND ORDER - 29**

the weight to afford the lay witness testimony. For these reasons, the Court finds the ALJ

did not err by not fully crediting the lay witnesses' testimony.

### C.        Residual Functioning Capacity

Petitioner provides a limited argument alleging the ALJ erred in determining her

RFC. At the fourth step in the sequential process, the ALJ determines whether the

impairments prevent the claimant from performing work which the claimant performed in

the past, i.e., whether the claimant has sufficient residual functional capacity to tolerate

the demands of any past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv);

416.920(a)(4)(iv). A claimant's residual functional capacity is the most she can do

despite her limitations. 20 C.F.R. § 404.1545(a). An ALJ considers all relevant evidence

in the record when making this determination. *Id.*  Generally, an ALJ may rely on

vocational expert testimony. 20 C.F.R. § 404.1566(e); *Bayliss v. Barnhart*, 427 F.3d

1211, 1218 (9th Cir. 2005). An ALJ must include all limitations supported by substantial

evidence in the hypothetical question to the vocational expert but may exclude

unsupported limitations. *Bayliss*, 427 F.3d at 1217.

In this matter, Petitioner asserts that the ALJ erred in determining Petitioner's

RFC, because he failed to include limitations identified by treating physicians. However,

the ALJ need not consider or include alleged impairments that have no support in the

record. *See Osenbrock v. Apfel*, 240 F.3d 1157, 1163–64 (9th Cir. 2000). Petitioner

additionally argues that the ALJ failed to include an opinion provided by Dr. Arnold, that

being that Petitioner would need a hand held device, such as a cane, to walk and that she

**MEMORANDUM DECISION AND ORDER - 30**

would need to alternate between sitting and standing to relieve pain and discomfort. (*See* Dkt. 14 at 18.)

However, upon review, it is clear that the ALJ did make these types of considerations. Specifically, the ALJ included a hypothetical that asked the vocational expert for an opinion should the working individual need to change positions every 30 minutes, while staying on task at the sedentary occupational level. (AR 80.) This included a maximum of two hours standing or walking and that the individual could perform in those positions for no more than thirty minutes. *Id.* Importantly, one of the ALJ's questions included the requirement that the individual be allowed to use a wheelchair in the work environment—including while sitting at her desk, and that the person would need to also stand at her workstation. Thus, the ALJ considered the very situations that Petitioner asserts he did not. For these reasons, the Court finds the ALJ did not err in determining the RFC, because he included all of Petitioner's limitations supported by substantial evidence in his hypothetical questions to the vocational expert. In doing this, the ALJ was not required to include limitations properly discounted in the steps above.

## ORDER

Based upon the foregoing, the Court being otherwise fully advised in the premises, **it is hereby ORDERED that** the Commissioner's decision finding that the Petitioner is not disabled within the meaning of the Social Security Act is **AFFIRMED** and that the petition for review is **DISMISSED**.

DATED: March 08, 2019

Candy W. Dale
U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 31**